## SOUTH FLORIDA LUMBER MILLS v. BREUCHAUD.

### No. 6080.

Circuit Court of Appeals, Fifth Circuit. June 30, 1931.

Rehearing Denied Aug. 5, 1931.

N. B. K. Pettingill and Howard P. Macfarlane, both of Tampa, Fla. (Macfarlane, Pettingill, Macfarlane & Fowler, of Tampa, Fla., of counsel), for appellant.

G. E. Mabry, O. K. Reaves, and Morris E. White, all of Tampa, Fla., and Geo. W. Scofield, of Inverness, Fla. (E. C. Johnson and Mabry, Reaves & White, all of Tampa, Fla., of counsel), for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellant, plaintiff below, brought its suit to charge defendant on an oral promise to pay the first maturing of several notes executed by Breuchaud as president of Inverness Company, dated November 18, 1926, and due January 1, 1928, 1929, et seq. Plaintiff offered the note and the oral testimony of Rankin and Fechtig, officers and owners of the plaintiff company. It proved that during the land boom in Florida plaintiff through Fechtig had sold Inverness Company, Breuchaud, president and owner, a tract of land there subject to a first mortgage for $25,000, taking back notes secured by second mortgage on the land and indorsed by Breuchaud for $250,000; that, the boom breaking, the fictitious values suddenly collapsing, Breuchaud, realizing that he had tremendously overbought himself, commenced negotiations to bring the notes into relation to the real value of the property purchased.

Rankin testified, in substance: That at a meeting in New York City between him,

Fechtig, and Breuchaud, Breuchaud demanded that the obligation on the notes be cut in half. "Also we were to allow him to leave his name off the new notes. The reason for his asking this was he wanted to borrow money at the Bank and to be able to make a statement to the bank that he was not liable on the notes. If he were on the notes he could not make the statement. He offered me personally if I would let him have the notes that he endorsed, he would pay the new notes. He told me that time and time again. He said that he would not have to show the $150,000 liability to the bank though he was going to pay it. His words were "If you will relieve me of my endorsement on the $250,000 and accept my personal promise to pay these new notes, it will relieve me from having to put them in my statement to the bank and will enable me to borrow money that I need to borrow." Further testifying, he said: "At the time the notes for $250,000 were surrendered to him, he (Breuchaud) did say that he would pay the $150,000 worth of notes that were taken in lieu. But this was not the reason of the exchange. I was induced to make the exchange by Dr. Fechtig who was a long time friend of Breuchaud's; if it had not been for Fechtig's insistence I would never have consented. In making it I relied upon Breuchaud's promise to pay the $150,000 of notes but that promise was not the inducement for the exchange because I already had his endorsement on the $250,000. Dr. Fechtig told me that he knew Breuchaud would carry out what he had agreed to do as he was a man of honor. Breuchaud said he would be embarrassed by showing this liability in going to the Bank. He also said he wanted to go to the Bank to get the money to pay the $25,000 which was the note that he paid on November 18, 1926, on the first mortgage. He said that though he agreed to pay the $150,000 he would not have to show that to the Bank as that was the kind of obligation that did not have to go into the bank statement."

Dr. Fechtig testified: "The agreement was that Mr. Breuchaud was to be released from his personal warranty because he said he could not go to the bank with all those signatures out and borrow any money. Mr. Rankin turned over the old notes and Mr. Breuchaud again stated that he would pay the amount of the new ones. The only reason Mr. Breuchaud said his obligation should be reduced and his signature released was that he could not go to the bank and get the money with his signature on $250,000 worth of notes. He said if Rankin would make

this arrangement he would pay these notes himself. There was nothing said in conversation about paying the first mortgage or giving South Florida Lmbr. Mills other mortgages." He also testified that, after Breuchaud said he would pay these notes, the papers were exchanged, new notes were given, and the old notes surrendered.

Defendant proved by Rankin and by Fechtig that, after the conversation with Breuchaud had taken place in New York, they concluded to make substantially the concession first required by defendant that the notes be reduced in amount and Breuchaud released from liability on them, and that Rankin made out a slip which, among other things, contained these words, "$25,000 a year; 7%; Release from notes; $25,000 mortgage 7%; $8000 on garage; $4000 on three houses; $2500 on other two houses"; that the matters were to be finally closed in Florida.

These negotiations, begun in New York, concluded in Florida, resulted in the execution at Tampa on November 18, 1926, of the following papers:

An indenture which, after describing the property and reciting the execution of the original notes for $250,000, provided that the clause in the mortgage with reference to these notes should be modified to show $150,000 in lieu of $250,000; that new notes with new terms should be substituted for the old notes. It further provided that interest should be paid to January 1, 1927, on the original $250,000 of notes, and that the proceeds of the first note, due January 1, 1927, were to be applied to the discharge of the first mortgage note, and in lieu of that note, the proceeds of which were to be so used, Inverness would make six other notes aggregating the sum of $25,000 secured on other property owned by Inverness Company.

A letter from defendant to plaintiff agreeing that the first mortgage was to be paid off, not on January 1, 1927, as stated in the contract, but immediately, and the first maturing note was to be surrendered at the time, and then the Inverness notes for $250,000 to be surrendered upon delivery of the smaller notes called for in the agreement.

Also a letter from defendant to plaintiff containing his personal agreement to furnish the abstracts securing the new small notes, to deliver the insurance policies paid in advance for three years, and to be personally responsible for the payment of interest on the $250,000 on January 1, 1927. The de-

492

fendant, to show plaintiff's own understanding that not Breuchaud, but Inverness alone, was responsible on the notes, offered a letter from Rankin to Inverness, dated December 8, 1927, demanding payment of the notes, and a telegram from Rankin reading in part, "South Florida Lbr. Mills asked only assurance from Breuchaud that adjusted payments should be met which assurance was given in consideration of their reducing the payments and relieving him from personal liability."

At the conclusion of its proof the defendant filed its motion to strike the testimony of plaintiff's witnesses that the defendant had orally promised to pay, because (1) the parties having finally integrated their negotiations into writing, these writings constituted their agreement; (2) because the testimony presented an effort in violation of the statute of frauds, section 5779, Comp. Gen. Laws Fla. 1927 (a) to charge defendant with the debt and default of another (b) to charge him upon an agreement not to be performed within one year from its making. The motion was sustained upon the first ground, and the testimony stricken.

■ Thereafter plaintiff, in support of its position that the writings were not constitutive of the entire agreement, offered by Rankin, its president, to orally explain and limit the purpose and effect of the Breuchaud letters executed contemporaneously with and as a part of the contract of November 18, 1926. Defendant objecting, the offer was properly rejected. Cargill · v. Swartwood, 159 Minn. 1, 198 N. W. 536; Fentress v. Steele, 110 Va. 578, 66 S. E. 870; Chute Co. v. Latta, 123 Minn. 69, 142 N. W. 1048; Note 70 A. L. R. page 754. Thereupon the witness testified that he had refused to accept the documents executed by the plaintiff and the Inverness Company until the two letters had been written and executed by Breuchaud. This concluding the testimony, the court upon motion instructed a verdict for the defendant. From the judgment following, this appeal is prosecuted. Appellant here vigorously presents that the issue tendered by its pleadings and its evidence, that defendant orally promised to pay the note, should have been sent to the jury; that neither is the case one within the statute of frauds nor one of an attempt to orally impeach a written contract.

As to the statutory defense, it maintains that the promise sued on is direct and immediate, not collateral and mediate, Meinrath Brokerage Co. v. Collins (C. C. A.) 298 F. 377; Cincinnati Traction Co. v. Cole et al. (C. C. A.) 258 F. 169, and that the fact of the delivery up by plaintiff of the original notes which defendant had indorsed constituted such performance on its part as to change the contract from an executory to a partly executed one, and therefore to take it out of the time section of the Florida statute. Wilson v. American Co. (C. C. A.) 33 F.(2d) 812, to which defendant makes reply: (1) If the claimed promise of Breuchaud has any import other than a mere moral assurance that he would see the debt paid, it was merely a collateral agreement; that Breuchaud's saying of it, "though he agreed to pay it he would not have to show that to the Bank as that was the kind of obligation that did not have to go into a bank statement," was merely a collateral assurance that Inverness would pay it. (2) (a) That, if it was a direct obligation it was within the time section of the statute, McKeany v. Black, 117 Cal. 587, 49 P. 710; and that, while many authorities do hold that it is only to contracts still executory on both sides that the statute applies, this is not a correct statement of the law. 25 R. C. L. § 40, pages 463, · 464; Page on Contracts, vol. 2, § 1295; Jackson Iron Co. v. Negaunee (C. C. A.) 65 F. 298; Mills v. Joiner, 20 Fla. 479. (b) Further that, conceding that part performance may serve sometimes to take this kind of promise out of the statute, it cannot do it here because the part performance claimed here is not referable, as the law requires, entirely to the oral contract. Cooper v. Colson, 66 N. J. Eq. 328, 58 A. 337, 105 Am. St. Rep. 660, 1 Ann. Cas. 997; Kratzer v. Day (C. C. A.) 12 F.(2d) 724; Broadway Hospital, etc., v. Decker, 47 Wash. 586, 92 P. 445; Horton v. Stegmyer (C. C. A.) 175 F. 756, 20 Ann. Cas. 1134.

As to the defense of parol variance, appellant says: That, while it is true enough that as between Inverness and plaintiff the whole contract was put in writing, such is not the case as between the defendant and plaintiff. That the evidence establishes that not one, but three, agreements were contemporaneously made: (1) An agreement between plaintiff and Inverness Company evidenced by the written contract of date November 18, 1926, changing the amount of the mortgage notes and providing for the discharge of the first mortgage and the execution by Inverness of the small notes secured on the other property; (2) an agreement between Breuchaud and plaintiff evidenced by the letters of November 18, 1926; (3) the oral contract sued on. That the first instrument effected a change and nova-

tion of the contract theretofore existing between Inverness and South Florida, the second and third effected changes in the contract between plaintiff and Breuchaud theretofore evidenced by Breuchaud's indorsement on the $250,000 notes. That the oral contract being entirely independent of the other two, proof of it does not run counter to the rule. Cohn v. Dunn, 111 Conn. 342, 149 A. 851, 70 A. L. R. 740; Danielson v. Bank of Scandinavia, 201 Wis. 392, 230 N. W. 83, 70 A. L. R. 746; Atlanta Motor Co. v. Duncan (Tex. Civ. App.) 1 S.W.(2d) 749; Miller v. Shelby Co. (Tex. Civ. App.) 30 S. W.(2d) 668.

Appellee replies there were not three contracts, there was one; that there were indeed negotiations concerning the subject-matter in which many discussions were had, but that they were all integrated into one agreement providing for the reduction of the indebtedness and the better securing of the reduced amount; that this integration was accomplished by the agreements in writing for the reduction in and the exchange of the notes, the bettering of the security of the reduced principal by payment of the first mortgage and the giving by Inverness of additional land as security, and the better securing of the agreement to pay the interest on the existing indebtedness to January 1, 1927, by taking defendant's written promise to pay it; that the documents and letters executed by Inverness, Breuchaud, and plaintiff on November 18, 1926, completely integrated all of the preliminary negotiations into one agreement between plaintiff, defendant, and Inverness, and thereafter constituted the contract, and that the oral evidence offered was wholly ineffective. Bryant v. Bryant, 295 Pa. 146, 144 A. 904; Ruppert v. Singhi, 243 N. Y. 156, 153 N. E. 33; Milton v. Burton, 79 Fla. 266, 84 So. 147; Mitchill v. Lath, 247 N. Y. 377, 160 N. E. 646, 68 A. L. R. 239; 2 Williston on Contracts, § 631; 5 Wigmore, §§ 2425, 2426; 70 A. L. R. 752 et seq., though it was received without objection, Mears v. Smith, 199 Mass. 319, 85 N. E. 165; Butterick Pub. Co. v. Fisher, 203 Mass. 122, 89 N. E. 189, 190, 133 Am. St. Rep. 283; O'Malley v. Grady, 222 Mass. 202, 109 N. E. 829; Mitchill v. Lath, 247 N. Y. 377, 160 N. E. 646, 68 A. L. R. 240, especially as defendant raised the point in the trial court by motion to strike, Brady v. Nally, 151 N. Y. 258, 45 N. E. 547.

■ We agree with appellee that the statements attributed to Breuchaud have, if made as claimed, no contractual force; that this is not a case, as appellant would have it appear, of an oral promise which, while relating to the subject-matter with which the main contract is concerned, is collateral to and independent of it and constitutes a separate contract binding defendant separately and immediately to plaintiff. It is a case where if the words relied on were uttered with contractual intent, they were uttered as a part of negotiations which in their final constitution took a different form, and therefore are not merely unprovable, but if proved are wholly immaterial to the issue, for "a legal transaction when reduced to writing is now conceived of as constituted, not merely indisputably proved, by the writing." 5 Wigmore, § 2426; Mears v. Smith, 199 Mass. 319, 85 N. E. 165; Milton v. Burton, 79 Fla. 266, 84 So. 147.

There is no difficulty whatever in stating the general principles controlling the decision of questions of the nature here presented. The books are full of cases illustrating the difficulty and uncertainty in result which spring from their attempted application. The whole matter is presented in an authoritative way in 5 Wigmore, § 2426, and excellently summarized in 2 Williston on Contracts, § 631, p. 1221 et seq. while a note to Danielson v. Bank of Scandinavia, 70 A. L. R. 746, itself a well considered case, in an exhaustive and thorough way further interestingly discusses the matter.

■ It is settled law that under the rule applicable to a situation of this kind it was the duty of the trial court primarily to determine whether the matter sought to be orally proven has been integrated in the written agreement, by ascertaining from the conduct and language of the parties, and the surrounding circumstances, what was their intent. 5 Wigmore, § 2430. The difficulty arises in applying the rule.

One of the best statements of the rule, and the test for applying it is this from Bryant v. Bryant, 295 Pa. 146, 144 A. 904, 906: "It is undoubtedly true that, where it is conceded or proven that a writing does not properly or fully state the agreement between the parties upon any given point, the written provisions in regard thereto may be explained or supplemented, and the true state of facts established by parol evidence. * * * If the terms of the covenant are put in a writing, complete within itself, and couched in such terms as to disclose a complete legal obligation, without any uncertainty as to the object or extent of the engagement, it is conclusively presumed to represent the whole

contract of the parties and the extent and manner of their undertaking. Gianni v. Russell, 281 Pa. 320, 126 A. 791. The test, to determine whether an alleged parol agreement, by which it is proposed to modify the expressed understanding, comes within the field embraced by the writing, is to compare the two and determine whether parties, situated as were the ones to the contract, would naturally and normally include the one in the other, if it were made. Wagner v. Marcus, 288 Pa. 579, 136 A. 847." Bryant v. Bryant, supra.

Turning to. the facts of the case in an effort to apply the rule to its solution, we easily reach the conclusion, in the light of the history of the negotiations, beginning in New York and concluding in Florida, of the demand of Breuchaud that he be released from his personal warranty so that he could borrow money from the bank, of the written memorandum made by Rankin, showing "release from notes," the insistence of Rankin that he would not let the trade go through except Breuchaud wrote the contractual letter of November 18, 1926, of the telegram of Rankin, in which he declares that the agreement involved a release of Breuchaud's personal liability, that the parties intended to embrace and did embrace, to integrate and did integrate in the writings of November 18 all of the legal and binding agreements which they desired to make.

We are the more confirmed in the view that the court below was right in refusing contractual import to the oral evidence of the plaintiff, for we think that, conceding all the legal effect which the language under the circumstances of its utterance could possibly carry, it amounts to no more than the moral assurance of plaintiff that he would see that the debt was paid, and that it was never intended by the parties to have any other or different effect.

To find a legal agreement fixing a direct and enforceable liability against Breuchaud upon facts of this kind would be to find that plaintiff and defendant had in effect agreed that the notes should be indorsed with invisible ink, and to give effect to a conspiracy to deceive by arranging for a secret indebtedness to be concealed from creditors who would lend to him on the faith of a correct statement of his liabilities, but to be disclosed whenever necessary to defeat advances thus induced.

While our view that no enforceable agreement was ever made makes it unnecessary to determine whether the promise, if made, falls within the statute, we think we should say that it does, for, if what was done can be erected into a promise to pay, it was at most a collateral assurance or guaranty of the company's payment, and the part performance relied upon to take it out of the statute, the surrender of the notes to Breuchaud, is referable not only nor even mainly to the oral promise of Breuchaud, but was a necessary result of the carrying out of the agreement between the plaintiff and Inverness.

The judgment of the court below is affirmed.